**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CASE NO. : 3:-19-cv-00185-TJC-JBT**

**FULTON B. LISS,** an individual**,**

                            Plaintiffs,

vs.

**THE CITY OF JACKSONVILLE,**
a municipality,  **SHERIFF MIKE WILLIAMS,**
in his official capacity, **BRENDA LUNA, ARPN,**
in her individual capacity, **JACKSONVILLE**
**CORRECTIONAL OFFICER(S) ASSIGNED**
**TO BOOKING AND TO 6W-2A,**  and
**JACKSONVILLE SUPERVISORY**
**CORRECTIONAL OFFICERS ASSIGNED**
**TO BOOKING AND TO 6W-2A,**

                            Defendants.
_____/

## FIRST AMENDED COMPLAINT FOR MONETARY DAMAGES AND DEMAND FOR JURY TRIAL

*COMES NOW,* Plaintiff, **FULTON P. LISS**, an individual, by and through

undersigned counsel, hereby sues The City of Jacksonville, a municipality, Sheriff Mike

Williams, supervisory and correctional officers of the Jacksonville Sheriff's Office assigned

to booking and to 6W-2A, and Brenda Luna, a medical provider in the Division of Health

Services for the Office of the Sheriff, and alleges the following:

## PRELIMINARY STATEMENT

1. This lawsuit arises out of two separate but related events: an unprovoked and

malicious battery of a pretrial detainee perpetrated by the correctional officer(s) and the

denial of adequate and timely medical care.   The Plaintiff, Mr. Fulton Liss, is a retired

building developer in the Washington D.C, and Baltimore area, a former collegiate tennis player. He had been recovering from a past surgery to address an acoustic neuroma. He later had surgery to perform a resection for a vestibular nerve. He became bedridden and complained of vertigo and imbalance, experiencing explosive headaches. He took a flight from his home in Baltimore, MD to fly to visit family in West Palm Beach, Florida. After his arrest at the airport, he was booked in the Pretrial Detention Facility ("PDF") and brought to the jail nurse for an intake evaluation. During the evaluation, the Plaintiff's medical condition including his surgery was charted and noted, including his medications consisting of multiple prescriptions for pain management. Jameson Walters, the attending provider, noted that he appeared to be confused and ordered a mental health lock down. The medications that his treating physician had prescribed were not provided. Instead, Brenda Luna, ARNP, prescribed klonopin and flexeril protocols as part of a mental health regiment. Nurse Luna added, she was concerned he "will be having withdrawal symptoms." Yet he never received any present medical treatment for his pain management and exploding headaches.

2. During the booking process and after he was placed into a cell (and later close management), Liss had asked for his medications which he was to take every 3 hours. If he did not receive them, he would experience exploding headaches. He was instead assaulted, drug on the floor, and told he would not be getting any of his pain medications.[1] The jail guards ignored his pleas for medical care, and he was denied adequate and timely medical

---

[1] The jail nurse notes the sores on his arms which had bled and she bandaged as a result of the battery and being dragged on the floor.

care by the medical staff (Brenda Luna ARNP) to manage his post-surgical exploding headaches and pain.

3. The instant lawsuit seeks monetary damages for: (1) the use of excessive force in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) the denial of adequate medical care in violation of the Fourteenth Amendment to the United States Constitution; and (3) committing the state law tort of battery.

4. Plaintiff Liss was charged by information on March 25, 2014, with resisting or opposing an officer without violence pursuant to Section 843.02, Florida Statutes, and the charges were dropped by the State of Florida after a prosecution was initiated.

**JURISDICTION AND VENUE**

5. The Plaintiff invokes the jurisdiction of the Court pursuant to 42 U.S.C. Section 1983 and 1988 and 28 U.S.C. Section 1331 and 1343, as to the federal claims herein.

6. Venue in this Court is proper pursuant to 28 U.S.C. Section 1391, in that the acts complained of herein occurred in the district. The remaining claims are state law claims which are permitted by the sovereign immunity statute codified by Section 768.28, Florida Statutes. All conditions precedent to suit have been complied with as set forth in Jacksonville Municipal Code 112.210 and Section 768.28, Florida Statutes, including all statutory notices served by First Class Mail Return Receipt Requested to the respective

agencies of the State of Florida and the Department of Insurance (Division of Financial Services).[2]

## PARTIES

7.     The Plaintiff, **FULTON P. LISS**, is an individual, and is a resident of the State of Maryland.

8.     Defendant, **CITY OF JACKSONVILLE**, is a municipality and agency of the State of Florida.

9.     At all times material hereto, the Defendant **BRENDA LUNA ARNP**, is a medical staff nurse who is employed by the Jacksonville Sheriff's Office and acting under the direction and supervision of the Chief Medical Director of the Division of Health Services for the Office of the Sheriff.  The Chief Medical Director of Health Services is the medical provider employed by the Sheriff, the policy maker for all medical protocol and policies as set forth in *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989). The medical provider for the Sheriff Mike Williams has a statutory duty to provide the medical care necessary to satisfy the Constitutional standard(s) set forth in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) and *Anacata*, *infra*.

10.     The Defendant, **MIKE WILLIAMS**, in his official capacity as the Sheriff of Duval County, Florida, as successor to Sheriff John Rutherford and at all times material hereto, responsible for the supervision, training, instruction, discipline, control and conduct of police officers of the Jacksonville Sheriff's Office ("JSO") and made policies for the JSO

---

[2] Jacksonville Risk Management was assigned to its insurer File No.:1520-00273.  The City of Jacksonville was placed on notice as to the state law claims.  The state law claims are part of the common nucleus of operative facts and arise out of the "same transaction and occurrence."

with respect to the Fourth Amendment searches, seizure, arrest, use of force.    The Sheriff was aware or should have been aware of the internal affairs process and procedures, which are his exclusive responsibility.  This includes both actual and constructive knowledge of the systems employed, the triggering mechanisms for targeting excessive force, and the statistical percentages and data accumulated for reporting purposes and to ensure compliance with Constitutional standards for the management of excessive force complaints.  The Sheriff is responsible for the internal affairs system in place, the review of the excessive force complaints filed and their conclusions, and reporting this data as required to the Department of Justice.  The City of Jacksonville complaints are sustained at the rate of 1.5% which is below the national averages and results in 99% receiving no punishment, discipline, or additional training.  The Sheriff is also responsible for providing inmates with access to medical care that is adequate and conforms to the Constitutional standards, which includes evaluation, screening, treatment, medication, and access to higher level care. The Sheriff employs a Chief Medical Director of the Division of Health Services for the Office of the Sheriff, who is the policy maker with respect to medical affairs in the Pretrial Detention Facility. *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989).

11.    The Sheriff either has actual knowledge of the use of force, the rates at which the complaints were sustained, and the training deficiency(ies) or should have known of the wide-spread civil rights violations due to excessive force and unreasonable searches and seizures.[3]  Likewise, the Sheriff is charged with actual knowledge of the medical grievances

---

[3] Even though the Internal Affairs complaints are purged from the employees files based upon the contract with the police union ) and Florida records laws, the Department keeps and maintains a printout of all prior complaints, and the disposition of each complaint.

and complaints by the inmates, after action reports (following death of inmates), and the screening of inmates upon their entry into the facility.  The detention facility has a policy, practice or custom of not utilizing the inmates medications (prescriptions prescribed by a provider) until the facility is able to obtain the prescription (if it is not one in inventory on the premises).  Further, the detention facility has a policy of  not utilizing the area hospitals for interim treatment and monitoring of serious medical conditions, including pain management.  Instead, the inmates are prescribed over the counter medications such as ibuprofen.  The inmates do not receive Constitutional pain management medications, evaluation, and observation to ensure that they are not compromised by the booking process and precluded from utilizing lawful prescriptions.

12.    At all times hereto, Defendant Sheriff Mike Williams, as the elected and Constitutional officer for the City of Jacksonville (as successor to Sheriff John Rutherford), had the power, right and duty to train and control his officers, agents, and employees to conform to the Constitution of the United States and to ensure that all orders, rules, instructions, and regulations promulgated for the JSO were consistent with the Constitution of the United States.  Based upon the statistical data and the history of the internal affairs complaints which number in excess of 500, the Sheriff had failed to implement a program for training officers on the constitutional use of force, to remediate violations, and maintaining supervisory control of the officers of the department --- for whom using force is foreseeable

in any citizen encounter.[4]   At all times material hereto, his agents and employees were acting under the color of State law.

13.     The Pretrial Detention Facility is a jail operated by the Sheriff of the Consolidated City of Jacksonville and is required by both state and federal law to provide timely access to medical care, ensure that the conditions of confinement are not "cruel and unusual" which includes unnecessary pain and suffering, and the City of Jacksonville has a constitutional responsibility for the medical care entrusted to it under the Supervision of the Sheriff, which includes the supervision of the Medical Director in the Division of Health Services for the Office of the Sheriff, medical staff and all providers to provide health care that is constitutionally mandated as set forth in *Estelle v. Gamble*.   At all times material hereto, the medical care providers serve under the direction of the Sheriff and are charged by law with providing timely and adequate medical care under the Eighth and Fourteenth Amendment for inmates and/or pretrial detainees when in confinement, and to address the inmates serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   The Sheriff has been aware of the previous lawsuits, complaints, grievances (medical), and deaths in the jail brought about by lack of access to or delayed access to adequate medical care.

14.     At all times material hereto, the Defendant **JACKSONVILLE CORRECTIONAL OFFICER(S) ASSIGNED TO BOOKING AND TO 6W-2A**, are employed by the Jacksonville Sheriff's Office and are under the authority of the Chief of Jails, and under the direction and control of the Sheriff of the City of Jacksonville.   The Defendant was acting pursuant to either official policy or the custom and practice of the

---

[4] In the case of *Myra Martinez v. City of Jacksonville* the District Court (Judge Harvey E. Schlesinger) noted 10 specific instances of excessive force since 2004 which are part of the alleged wide-spread pattern of abuse.

Jacksonville Sheriff's Office or was the final policy maker with respect to medical care, standards, access to the medical care, and with administering discipline, use of force, and imposing punishment for violation of the jail rules and regulations.  The Defendant has a duty under state law pursuant to *Kelly v. Rice* to provide timely access to medical care.  The Defendant correctional officers are sued in their official capacity.

15.      At all times material hereto, the Defendant **JACKSONVILLE SUPERVISORY CORRECTIONAL OFFICERS ASSIGNED TO BOOKING AND TO 6W-2A**, are employed by the Jacksonville Sheriff's Office and are under the authority of the The Defendant was acting pursuant to either official policy or the custom and practice of the Jacksonville Sheriff's Office or was the final policy maker with respect to medical care, standards, access to the medical care, and with administering discipline, use of force, and imposing punishment for violation of the jail rules and regulations.  The Defendant officers have a duty under state law pursuant to *Kelly v. Rice* to provide timely access to medical care.  The Defendant is sued in his official capacity.

## FACTUAL AND GENERAL ALLEGATIONS

16.      On March 8, 2014, the Plaintiff was flying from his home in Maryland out of Washington D.C. to his destination in West Palm Beach, Florida.  He was traveling for a family visit which was his first trip since the tumor surgery.

17.      When the aircraft was diverted to JIA, the Plaintiff exited the plane onto the jetway, where he was approached by Cpl. McCrory, who advised him he was being detained for questioning.

18.     The Plaintiff was then arrested, placed in handcuffs, and placed in a wheelchair for transport "due to refusing to walk on his own accord to the police office."

19.     After arresting Plaintiff, Corporal McCrory called for medical assistance to treat abrasions to his wrists and to evaluate him due to his stated illness(es) and various medications.   It was known at that time that the Plaintiff had a medical condition that was a serious medical condition following surgery for an acoustic neuroma which affected his ability to walk and balance due to his surgery, headaches, vertigo, and chronic migraines that felt like his head would explode.[5]   He was under the care of his physicians which included pain management and various narcotics.

20.     Upon being taken into custody, then, the aviation officers were aware of the Plaintiff's medical condition and need for boarding assistance and medication (including pain medications for severe pain).[6]

21.     The Plaintiff's medical condition affected his mobility, and he was otherwise a fall risk.

22.     The Plaintiff was transported to the Jacksonville Pretrial Detention Facility and was booked on the charge of resisting arrest without violence.

23.     After Plaintiff was booked into the pretrial detention facility, the Plaintiff began the booking process.  As he proceeded, he was directed into a room.

24.     The Plaintiff wanted to call his son in West Palm who was waiting for him at the airport. He also was requesting his medication because of his need to have the pain

---

[5] This information is imputed to JSO pursuant to the "fellow officer rule."
[6] To constitute a serious medical need, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." Case: 15-11412 Date Filed: 11/18/2016 Page: 20 of 52 21 *Mann*, 588 F.3d at 1307 (internal citation and quotation marks omitted).

medication every (3) three hours.

25.     The correctional officer(s) assaulted him, dragged him across the floor, and caused bleeding on his hands and arms.

26.     The Plaintiff banged on the window trying to get the correctional officers attention to obtain his necessary prescribed medications.

27.     Due to the surgical procedure, the Plaintiff experienced explosive pain and headaches which required the regular dosing of pain medication.

28.     After the intake and screening by the medical staff, Jameson Walters and Brenda Luna, ARNP, the Plaintiff was placed in a mental health classification on 6W-2A.

29.     The Plaintiff's headaches and resulting pain was severe, constant, an explosive-like headache, mainly starting at the posterior occiput, but then will quickly form to the top of his head more at the crown.  The Plaintiff frequently feels faint, has near falls, dizziness, and a spinning sensation.

30.     Due to the Plaintiff's acoustic neuroma[7] Dr. John F. Dumbrowki, M.D., prescribed various pain medication including opioids and benzos for acute vertigo, headaches, severe pain and other related symptoms.  He had been prescribed pain medications to treat the serious medical condition every 3 hours.

31.     Upon Plaintiff being booked into the Duval County Pretrial Detention Facility, the medical personnel are required to screen the pretrial detainees to obtain their

---

[7] Plaintiff had surgery in 2009 for this condition, with a follow-up resection to the nerve to repair it.  As the acoustic neuroma grows, it compresses the hearing and balance nerves, usually causing unilateral (one-sided) hearing loss, tinnitus (ringing in the ear), and dizziness or loss of balance. As it grows, it can also interfere with the facial sensation nerve (the trigeminal nerve), causing facial numbness. It can also exert pressure on nerves controlling the muscles of the face, causing facial weakness or paralysis on the side of the tumor. Vital life-sustaining functions can be threatened when large tumors cause severe pressure on the brainstem and cerebellum.

medical history and to determine if they require treatment or evaluation at a hospital to determine if they are medically cleared.  The correctional authorities are to ensure that each prisoner as soon as possible upon the prisoner's admission is screened to identify issues requiring immediate assessment or attention, such as illness, communicable diseases, mental health problems, drug or alcohol intoxication *or withdrawal*, ongoing medical treatment, risk of suicide, or special education eligibility. Adequate medical and mental health screening should include: (i) a  properly validated screening protocol, including, if appropriate, special protocols for female prisoners, prisoners who have mental disabilities, and prisoners who are under the age of eighteen or geriatric; (ii) be performed either by a qualified health care professional or by specially trained correctional staff; and (iii) include an initial assessment whether the prisoner has any condition that makes the use of chemical agents or electronic weaponry against that prisoner particularly risky.

32.     The facilities' medical personnel should take appropriate responsive measures without delay when intake screening identifies a need for immediate comprehensive assessment or for new or continuing medication or other treatment, suicide prevention measures, or housing that takes account of a prisoner's special needs.

33.     This includes the use of higher medical care and specialty physicians to assess, treat, diagnose, and evaluate.

34.     Also, the detention facility should store all prescription drugs safely and under the control and supervision of the physician in charge of the facility's health care program. Prescription drugs should be distributed in a timely and confidential manner. Ordinarily, only health care staff should administer prescription drugs, except that health care staff should be

permitted to authorize prisoners to hold and administer their own asthma inhalers, and to implement other reasonable "keep on person" drug policies.

35.     Although these operational standards for correctional health care are well-known, the detention facility and correctional officers did not provide Plaintiff -- who had knowledge of his serious medical condition post-operatively -- and need for his pain medications without which his pain, headaches, vertigo, and fall risk (including risk of seizures) would compromise his health and could lead to serious bodily injury.  The Pretrial Detention Facility and the staff knew of and disregarded the excessive risk to the inmate's serious medical need, and failed to provide him with the medications prescribed by his physician.

36.     As the Plaintiff continued to pursue with the correctional officers the need for his medication, the guard(s) told him that he would not be getting them.  The correctional officers and medical staff rejected his request for pain medications and did so with deliberate indifference, which failure increased his pain, suffering, and aggravated his exploding headaches, vertigo, and risk of death or serious bodily injury to include a fall risk and seizures.

37.     The correctional officers at the detention facility ignored his direct requests for assistance, and the intentional failure to provide this necessary medical care resulted in instability, vertigo, anxiety, pain, confusion, withdrawal symptoms, delusions, and severe headaches which is violative of the Eighth and Fourteenth Amendment.[8]

---

[8] *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994).

38.     Plaintiff's medical condition is a   "serious medical need" as it "has been *diagnosed* by a physician as mandating treatment or … is so obvious that even a lay person would easily recognize the necessity of a doctor's attention."   The foregoing medical condition is a serious medical condition and requires adequate access to medical care, which includes prescribed medications, assistance when walking, prevention of withdrawal and pain medications every three hours or as prescribed by a physician.  The failure to receive these pain medications can lead to serious bodily injury, increase the risk of harm and increased Plaintiff's level of pain.[9]

39.     The Plaintiff's treating physicians for neurology, pain management, vertigo, and his inner ear dysfunction had provided a comprehensive  plan of treatment for his serious medical post-operative needs, which included a detailed plan for prescription medication and behavioral therapy.

40.     The medical providers, Brenda Luna ARNP, who performed the intake and screening failed to provide the necessary medical treatment which was "grossly inadequate" and at times no care.[10]  Plaintiff required to be medically cleared by a hospital and upon evaluation of his condition provided with all of the necessary medications and treatment for his post-operative pain and exploding headaches.

41.     This "deliberate indifference" by the medical staff resulted in a deprivation of the Plaintiff's constitutional rights, subjected him to unwanton infliction of pain, risk of serious bodily injury including the risk of seizures.  When the Plaintiff arrived at the medical

---

[9] As a pretrial detainee the Plaintiff's rights are pursuant to the 14th Amendment.  *Mann*, 588 F.3d at 1306.
[10] *McElligott v. Foley*, 182 F.3d 1248(11th Cir. 1999).

facility, he fell out of the jail transport vehicle when the door was opened.  He was a known fall risk.

42.　　The constitutional rights violated were clearly established by the decisional law of the United States Supreme Court, and the law of the Eleventh Circuit.  There are no immunities to suit, and those have been addressed and defined by the decisional law.[11]

43.　　As a direct and proximate result of the willful and deliberate actions or inactions of the Defendants, the Decedent suffered mental, physical, unwanton pain, and emotional pain and suffering, which are continuing in nature.

44.　　As a direct and proximate result of the willful and deliberate actions of the Defendants, the Plaintiff has suffered grievously, and has been brought into public scandal, and with great humiliation, and mental suffering, and emotional harm.

### COUNT I – VIOLATION OF 42 U.S.C. SECTION 1983
### (STATE OF FLORIDA---POLICY "MOVING FORCE" FOR CONSTITUTIONAL DEPRIVATION UNDER *MONELL* (EXCESSIVE FORCE)

45.　　The Plaintiff re-alleges the factual allegations in paragraphs 13 through 44 which are incorporated by reference.

46.　　The Plaintiff sues the Defendant, Sheriff Williams, as successor to Sheriff John Rutherford, his agents and/or employees, acting within their authority and under color of State law, who instituted or followed practices, customs, and policies which were the moving force behind the deprivation of Plaintiff's rights to be free from excessive force,

---

[11]  The Eleventh Circuit held that the failure to treat pain, even for a few hours, was a constitutionally cognizable injury.  *Brown v. Hughes,* 894 F. 2d 1533 (11th Cir. 1990).

which is actionable under 42 U.S.C. Section 1983 as a violation of the Fourth and Fourteenth Amendments to the United States Constitution.   The Sheriff, Mike Williams, as successor to Sheriff John Rutherford had actual or constructive knowledge of the history of the excessive use of force by the Jacksonville Sheriff's Office, and despite having knowledge failed to act to discipline these officers and has by his conduct ratified their individual actions as official policy of the Jacksonville Sheriff's Office.

    a. **Statistical Data and Notice**: There have been 594 force complaints lodged against the current patrol officers. Of those complaints, just nine were "sustained" by internal investigators -- less than *1.52 percent.* The National Statistics compiled by the Department of Justice provide a national average of sustained complaints at 5-8%. *See* Department of Justice Statistics on Use of Force June 2006, NCJ 210296. https://www.bjs.gov/content/pub/pdf/ccpuf.pdf. Among these national use of force complaints having a final disposition:

    • 34% of the complaints were not sustained, meaning there was insufficient evidence to prove the allegation.

    • 25% of the complaints were unfounded, meaning that the complaint was not based on facts, or the reported incident did not occur.

    • 23% of the complaints resulted in officers being exonerated, meaning that the incident occurred, but the officer's action was deemed lawful and proper.

    • 8% of the complaints were sustained, meaning there was sufficient evidence to justify disciplinary action against the officer(s).

• 9% of the complaints had some other disposition (for example, the complaint was withdrawn).[12]

**b. Prior Cases of Excessive Force**.  There are many prior instances of documented excessive force which constitute a reasonable inference of the existence of a pattern and practice (un-sustained complaints) under *Monell*, which include *supra* the following cases:[13]

1. ***Brenton L. Butler v. City of Jacksonville, et al.* (Moore, Judge)**--struck a minor in his chest and face during a detention that lasted nearly 12 hours.  Threatened with a gun in order to coerce a confession and false arrest.

2. ***Barnes v. City of Jacksonville, et al.*,** Case No.: 08-cv-217-J-33JK.  In that case, the Jacksonville Sheriff's Officers struck Barnes despite the fact that Barnes complied with all of their commands and did not resist.

3.  In October 2007, two members of the Jacksonville Sheriff's Office, along with a civilian ride along rammed the head of Colin Runge into a steel door in the intake area of the jail.  The inmate was hog tied and in total appendage restraint.

4.  In January 2008, a member of the Jacksonville Sheriff's Office broke the jaw of Larue Perkins by slamming him to the pavement of a parking lot.  At the time he was complying and filed a complaint after the incident which was classified as NOT SUSTAINED.

---

[12] *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).
[13] Throughout the discovery process, the 594 complaints and those since then will be evaluated and provided to the Court as part of the statistical evidence of the use of force and the failure to sustain or sanction the conduct at trial, the efforts taken to actually investigate the claims, and then discipline.

5.  In March 2012, JSO questioned Kyle Fowler concerning a stolen vehicle.  After initially agreeing to talk to JSO,  he then elected to leave.  As he did, he was knocked to the ground, and he was falsely arrested and injured.

6.  In November 2014, a member of the JSO violently slammed Deandre Ezell's head into a concrete wall, while he was in handcuffs.  He was knocked unconscious and required hospitalization.

7.  ***Germaine Dubose v. City of Jacksonville***, et al., In that case, the Jacksonville Sheriff's Officers struck Germaine after removing him from the car without probable cause resulting in permanent injury to his back and neck.  The jury awarded damages after a trial on the claims.

8.  ***James Lunsford v. Rutherford, et al.***, Case No.: 09-cv-01015-MMH-MCR. While handcuffed, Mr. Lunsford was dropped on his head resulting in paralysis to Mr. Lunsford.  This occurred despite Lunsford's prior warning to the police that he had 4 screws and a plate in his neck.

9.  ***Johnny Clarity v. City of Jacksonville***--He was tazed after surrendering to the police, and Judge Brian Davis, United States District Court for the Middle District of Florida, denied qualified immunity to the officers of the Jacksonville Sheriff's Office.

10.  ***Kemp v. Rutherford, et al.***,.  In May 2010, an officer fractured multiple facial bones of David Kemp when the officer violently struck Mr. Kemp as he laid on the ground in compliance with the officer's commands to do so.

11.   ***Robert Slade*** was slammed to the ground in June 2013 causing him to hit his head, teeth and shoulder after being involved in a minor traffic accident.  He was arrested for resisting an office without violence and the charges were dropped.

12.   ***Naomi Hall v. City of Jacksonville***--arrested and force used that was excessive.

13.   ***Domonique Torrence v. City of Jacksonville, et al***.,---false arrest and then excessive force dragging him down an embankment off the highway resulting in injury.

14.   ***Mayra Martinez v. City of Jacksonville, et al***. Case No.: 17-cv-1310-J-20--excessive force.  Rookie police officer Akinyeme Borisade of the Jacksonville Sheriff's Office reported to the scene. He and a fellow officer pinned Ms. Martinez on the ground and used "ground and pound" techniques on her. It appears the officers also hit or shoved her head into the asphalt. She can be heard screaming from a good Samaritan's dashcam, "I didn't do anything."[14]

47.   Additionally, by failing to discipline the officers following the complaint(s) filed with internal affairs for excessive force or by failing to have a system in place to identify and address the widespread use of excessive force, Sheriff Mike Williams has knowingly ratified the officers' decisions and reasons for those decisions, thus constituting a practice, custom or policy.

48.   As a direct and proximate result of the willful and deliberate actions or inactions of Defendant Sheriff Williams to ensure compliance with constitutional standards for the use of force, to establish a system to identify the unnecessary use of force, to individually review complaints for the excessive use of force, and to discipline and remedy

---

[14] In that case, the Plaintiff sets forth 10 prior instances of excessive force with the officers similarly avoiding any discipline and are part of the 1.5% of sustained violations.

the officers conduct in conformity with the established Federal and State law, the Sheriff has established a pattern and practice of permitting the use of force in an unconstitutional manner, resulting in injury and damage.

49.     Plaintiff has suffered damages including but not limited to loss of liberty, monetary loss of earnings, injury to reputation, humiliation and severe emotional and psychological distress.

50.     The actions or inactions alleged above were undertaken or failed to be undertaken because of the Defendant's willful, wanton, callous and knowing disregard of the clearly established rights of Plaintiff as guaranteed by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, the Plaintiff demands judgment for damages, including compensatory damages, all costs, and interest provided under the applicable law and all other relief deemed equitable and just.

## COUNT II – VIOLATION OF 42 U.S.C. SECTION 1983
### (STATE OF FLORIDA---POLICY "MOVING FORCE" FOR CONSTITUTIONAL DEPRIVATION UNDER *MONELL* (DELAY AND/OR INADEQUATE MEDICAL TREATMENT WITH DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION)

51.     The Plaintiff re-alleges the factual allegations in paragraphs 13 through 44 which are incorporated by reference.

52.     The Plaintiff sues the Defendant, Sheriff Williams, as successor to Sheriff John Rutherford, his agents and/or employees, acting within their authority and under color of State law, who instituted or followed practices, customs, and policies which were the

moving force behind the deprivation of Plaintiff's rights to be free from a delay in or inadequate medical care, which is actionable under 42 U.S.C. Section 1983 as a violation of the Fourth and Fourteenth Amendments to the United States Constitution.   The Sheriff, Mike Williams, as successor to Sheriff John Rutherford had actual or constructive knowledge of the problems with the PTDF medical care since *Costello*, and despite having such knowledge failed to act to ensure that the medical providers and staff in the Medical Services Division provided adequate medical care that is constitutionally required by the Constitution of the United States, which instead is the official policy of the Jacksonville Sheriff's Office.

53.    The Director of the Medical Services Division for the Sheriff has been delegated the final authority and decision-making for all medical care, treatment, and diagnosis.  The medical staff, nurses, and employees operate under the direction, control, and supervision of the Director.

54.    The PTDF is the largest medical provider in Northeast Florida, and is responsible for the care and treatment of inmates entrusted to the Office of the Sheriff of the City of Jacksonville.

55.    The Plaintiff suffers from a "serious medical condition" which was diagnosed by his treating physician and was made known to the correctional officers, medical staff, or was otherwise obvious, and despite that serious condition and need for timely medical assistance, the correctional officers and/or medical provider(s) delayed, denied, or disregarded the Plaintiff's serious need.

56.    The 8th and 14th Amendment requires that prison officials provide *ready access* to adequate medical care, including access to competent medical providers, and

necessary pain medication. The Defendant did deny or delay the necessary medical treatment which was essential to address his serious medical condition, without which could result in death or serious bodily injury.[15]

57.     Dr. John F. Dombrowski, M.D., a board certified anesthesiologist and pain management physician has opined by affidavit that Plaintiff had a "serious medical condition" and that the failure to receive his medications would increase his occurrence of both vertigo and imbalance, and created a fall risk, increased risk of seizures, pain, and anxiety and depression.  Due to the medications he was taking including Xanax, Percocet, Famvir, Paxil, Suboxone, and Zocor, the failure to take the prescribed medications "cold turkey" can result in seizures, fall risk, sweating and headaches, fever or chills, nausea and vomiting, body aches, and increased heart rate.[16]

58.     In addition, the intended treatment (which Plaintiff never received) was grossly inadequate medical care or amounted to no care at all.

---

[15] A defendant also cannot deny or delay necessary medical treatment to coerce pre-payment by a person in custody without running afoul of the Eighth Case: 15-11412 Date Filed: 11/18/2016 Page: 24 of 52 25 Amendment.3 *Ancata*, 769 F.2d at 704 ("Delay in medical treatment cannot be justified as a means to coerce payment."); *see also Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (lack of funds does not "excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment"); *see also Hamm v. DeKalb Cty*., 774 F.2d 1567, 1573-74 (11th Cir. 1985) (state cannot completely deny medical care or provide care "below some minimally adequate level" to "limit[] the cost of detention").

[16] *Brown v. Hughes*, 894 F.2d 1533 (11th Cir.1990) ( the delay of a few hours in treating an inmate's broken foot could constitute a violation of the Eighth Amendment stating that "With this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves.").  *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir.1988) (reversing grant of summary judgment to prison officials on inmate's claim that delay in providing treatments that "eliminated pain and suffering at least temporarily" constituted deliberate indifference); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir.1985) (reversing directed verdict to officers who failed to provide ice pack and aspirin for pain caused by bleeding cut); *see also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir.1999) (reversing grant of summary judgment to prison guard who failed to provide pain medication to inmate); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

59.     The following are a sampling of cases involving the constitutional failure to provide timely and adequate medical care in the pretrial detention facility.

1.     **Ana Faye Miller v. City of Jacksonville (2004)** -- Prior to being booked, she was given cocaine with rat poison.  She was left in the jail without medical care (believing her to be suffering from withdrawal symptoms from drug use) and died without any medical care.

2.     **Deese v. City of Jacksonville** --- 3:06-cv-733-J-34HTS.

3.     **Jones v. City of Jacksonville** --- No. 13-10619 (2013).

4.     **Thomas v. City of Jacksonville** --- 12-cv-737-J-32MCR

5.     **Lina Odom**.  Other inmates in the jail who said his daughter passed out in the shower and immediately started turning purple. A few inmates carried her out to her bed in the middle of the women's dorm. Odom's father said other text messages he received go on to say the other inmates tried to get the attention of corrections officers, then one officer walked in and began yelling at the inmates for trying to help her.

6.     **Melvin Brown** -- died in his cell after sustaining a head injury.

7.     **Patricia Affrunti** -- she had just dropped off a friend at a methadone clinic and fell asleep because she was tired.  She became ill after being booked and left in isolation and did not receive timely medical care, screening, and treatment.

8.     **Jessica Gorkiewicz --** Her Father Mike said he spoke to her fellow inmates, including one who shared a cell with her who told him there was an incident with other inmates involving pepper spray while his daughter was pregnant and already having flu-like symptoms.  He was told his daughter began to complain of breathing problems

22

because of the pepper spray in the air, but she wasn't taken to UF Health until she was found unresponsive several hours later.  She had an emergency C-section at the hospital and died two days later.

9.    **SHERIFF JOHN RUTHERFORD** -- Jacksonville Sheriff John Rutherford learned in 2013 that the pretrial detention facility was the largest medical provider in Northeast Florida, was underfunded, and it was known that there were deficiencies in mental health and access to constitutionally required medical care.   "This city is a ticking time bomb," said Denise Marzullo, president and chief executive officer at Mental Health America of Northeast Florida. "Something tragic is going to happen if we don't do something."

10    Florida ranks 49th for per capita funding of mental health services in the United States, Marzullo said. Duval County receives less state funding for its residents than all but one other county in the state, she said.  The Pretrial Detention Facility is underfunded and is lacking in its medical staffing.

11.    ***Costello v. Wainwright*, 397 F. Supp  20 (M.D. Fla 1975) and *Miller v. Carson*, 401 F. Supp 835(M.D. Fla. 1975).**  Jacksonville Pretrial Detention Facility has a long history of inadequate medical care, which resulted in the Federal Courts (Judge Scott) taking over the supervision of the jail's medical care and facilities.

60.    As a result of the Defendants' willful, wanton, callous and knowing disregard of the clearly established rights of Plaintiff to have access to timely and adequate medical care and not to be denied necessary medical care to treat a serious medical condition

guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution,[17] the Plaintiff had experienced increased pain as a result of the delay in medical treatment, which pain was uwanton, unnecessary and increased his risk of substantial harm.[18]  He also had been at risk of death or serious bodily harm resulting from withdrawal of prescribed medications which include seizures and a fall risk.

61.    Additionally, by failing to address the medical care provided and to provide an effective oversight of the injuries, medical grievances, deaths, and delay in treatment the Sheriff has knowingly and with deliberate indifference provided inadequate medical care. further the Sheriff Mike Williams has knowingly ratified the medical decisions and reasons for those decisions, thus constituting a practice, custom or policy of the medical director for the medical services division.  Moreover, Defendant Williams, was aware or should have been aware that his agents and employees, acting within their authority and under color of state law, were in violation of the failure to provide adequate medical care and failed to remedy the failure to provide timely and adequate medical care--including the use of higher

---

[17]    As used and pled in this complaint, the clearly established law requires: "to state an Eighth Amendment violation for inadequate medical care under *Estelle v. Gamble, supra*, it must be shown that [Howard's] treatment was 'so grossly incompetent, inadequate or excessive .  or [was] a refusal to provide essential care.'  [Cit.]" *Alford v. Osei-Kwasi, supra* at 722-723(6), 418 S.E.2d 79.   Thus, knowledge for the purpose of deliberate indifference means <u>an awareness</u> that the inmate needs medical care because of a serious risk of harm from illness or injury, as evidenced by the clinical signs and symptoms that are readily observable by a reasonable person.    Knowledge for the purpose of deliberate indifference <u>does not</u> require a final diagnosis, correct diagnosis, or a complete medical history when the inmate has not been allowed to see and to be examined by a physician or <u>when medical care has been unreasonably delayed</u>.   *Adams v. Poag, supra* at 1544; *Brown v. Hughes, supra* at 1538; *Carswell v. Bay County, supra* at 457.

[18] *Aldridge v. Montgomery*, 753 F.2d 970, 972–73 (11th Cir. 1985) (a directed verdict in favor of jail officials was improper for a two-hour delay in treating a 1.5 inch cut above plaintiff's eye).

level care to assess, diagnose and treat, and delivery of prescription drugs to pretrial detainees.[19]

62.    As a direct and proximate result of the willful and deliberate actions or inactions of Defendant Sheriff Williams to review and remedy the officers conduct in conformity with the established Federal and State law, Plaintiff has suffered damages including but not limited to loss of liberty, monetary loss of earnings, injury to reputation, humiliation and severe emotional and psychological distress.

63.    The actions or inactions alleged above were undertaken or failed to be undertaken because of the Defendant's willful, wanton, callous and knowing disregard of the clearly established rights of Plaintiff as guaranteed by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, the Plaintiff demands judgment for damages, including compensatory damages, all costs, and interest provided under the applicable law and all other relief deemed equitable and just.

---

[19] This requirement to train is operational <u>and not</u> discretionary as it relates to the officer's use of force and is part of the pattern and practice for *Monell*.  The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. … To establish a municipality's 'deliberate indifference,' a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area." *American Federation of Labor and Congress of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1188-89 (11th Cir. 2011) (citations omitted); see also *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1145 (11th Cir. 2007) ("In order to sustain her claim that her injury was the result of improper training, Skop was required to bring forth some evidence of a pattern of improper training …, and she must show that Atlanta was aware of the deficiencies in the program.") (citations and internal marks omitted). Stated differently, "[m]unicipal policy or custom may include a failure to provide adequate training if the deficiency evidences a deliberate indifference to the rights of its inhabitants." *Lewis v. City of West Palm Beach*, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) (quotation omitted).

**COUNT III– VIOLATION OF 42 U.S.C. SECTION 1983**
**(STATE OF FLORIDA---DELAY AND/OR INADEQUATE MEDICAL**
**TREATMENT WITH DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL**
**CONDITION)**

64.     The Plaintiff re-alleges the factual allegations in paragraphs 13 through 44 which are incorporated by reference.

65.     The Plaintiff sues the Defendant, Brenda Luna ARNP, a nurse in the Medical Services Division, for the failure to provide timely and adequate medical care which is actionable under 42 U.S.C. Section 1983 as a violation of the Fourth and Fourteenth Amendments to the United States Constitution.

66.     The Director of the Medical Services Division for the Sheriff has been delegated the final authority and decision-making for all medical care, treatment, and diagnosis.  The medical staff, nurses, and employees operate under the direction, control, and supervision of the Director.  At all times material hereto, the Defendant was acting in conformity with her training and in the scope of her employment.

67.     The Defendant provided grossly inadequate medical care when treating the Plaintiff experiencing withdrawal symptoms.

68.     The Plaintiff suffers from a "serious medical condition" which was diagnosed by his treating physician and was made known during the intake of the serious condition and need for timely medical assistance.

69.     The Defendant did deny or delay the necessary medical treatment which was essential to address his serious medical condition, without which could result in death or serious bodily injury and resulted in unwanton infliction of pain.[20]

70.     Dr. John F. Dombrowski, M.D., a board certified anesthesiologist and pain management physician has opined by affidavit that Plaintiff had a "serious medical condition" and that the failure to receive his medications would increase his occurrence of both vertigo and imbalance, and created a fall risk, increased risk of seizures, pain, and anxiety and depression.  Due to the medications he was taking including Xanax, Percocet, Famvir, Paxil, Suboxone, and Zocor, the failure to take the prescribed medications "cold turkey" can result in seizures, fall risk, sweating and headaches, fever or chills, nausea and vomiting, body aches, and increased heart rate.[21]

---

[20] A defendant also cannot deny or delay necessary medical treatment to coerce pre-payment by a person in custody without running afoul of the Eighth Case: 15-11412 Date Filed: 11/18/2016 Page: 24 of 52 25 Amendment.3 *Ancata*, 769 F.2d at 704 ("Delay in medical treatment cannot be justified as a means to coerce payment."); *see also Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (lack of funds does not "excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment"); *see also Hamm v. DeKalb Cty*., 774 F.2d 1567, 1573-74 (11th Cir. 1985) (state cannot completely deny medical care or provide care "below some minimally adequate level" to "limit[] the cost of detention").

[21] *Brown v. Hughes*, 894 F.2d 1533 (11th Cir.1990) ( the delay of a few hours in treating an inmate's broken foot could constitute a violation of the Eighth Amendment stating that "With this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves.").  *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir.1988) (reversing grant of summary judgment to prison officials on inmate's claim that delay in providing treatments that "eliminated pain and suffering at least temporarily" constituted deliberate indifference); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir.1985) (reversing directed verdict to officers who failed to provide ice pack and aspirin for pain caused by bleeding cut); *see also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir.1999) (reversing grant of summary judgment to prison guard who failed to provide pain medication to inmate); Boretti *v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir.1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

71.     In addition, the intended treatment (which Plaintiff never received) to provide flexeril and klonopin was grossly inadequate medical care or no care at all.  Further, there was no medications provided to him or an assessment by a higher level care or hospital.

72.     The Defendant nurse should have assessed his withdrawal symptoms, sent him to a higher level of care, and to have him assessed for his medications and care.

73.     As a direct and proximate result of the willful and deliberate actions, Plaintiff has suffered damages including but not limited to loss of liberty, monetary loss of earnings, injury to reputation, humiliation and severe emotional and psychological distress.

74.     The actions or inactions alleged above were undertaken or failed to be undertaken because of the Defendant's willful, wanton, callous and knowing disregard of the clearly established rights of Plaintiff as guaranteed by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, the Plaintiff demands judgment for damages, including compensatory damages, all costs, and interest provided under the applicable law and all other relief deemed equitable and just.

## COUNT IV---STATE LAW CLAIM---BATTERY

75.     Plaintiff re-alleges the factual allegations in paragraphs 18 through 44.

76.     The Plaintiff sues the Defendants City of Jacksonville and JACKSONVILLE CORRECTIONAL OFFICER(S) ASSIGNED TO BOOKING AND TO 6W-2A, JACKSONVILLE SUPERVISORY CORRECTIONAL OFFICER(S) ASSIGNED TO BOOKING AND TO 6W-2A, for common law battery by intentionally touching Plaintiff against his will or conspiring to commit battery.  Further, the amount of force used was

objectively unreasonable and unnecessary for Defendants to defend themselves, or any other person, from bodily harm during the incarceration of Plaintiff.  The Defendants were acting within the scope of their employment at all times material hereto.

77.     Alternatively, if the battery was not committed by the individual correctional officers and supervisory officers during the scope of their employment for the Defendant Sheriff Mike Williams, in his official capacity or was committed with bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property, the battery was then committed in their individual capacity.

**WHEREFORE**, the Plaintiffs respectfully pray this Court will award the following relief, and any and all other relief deemed appropriate:

A.     Judgment for damages due to the excessive force, and due to the inmate's serious medical condition and failure to timely provide adequate medical care;

B.     Judgment for Punitive damages as permitted by federal law; [22]

C.     An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. Section 1988, as to those counts alleging federal claims to which attorney's fees are recoverable;

E.     Any other relief which the court deems appropriate and just.

---

[22] Punitive damages are available under § 1983. *See Smith v. Wade*, 461 U.S. 30, 35 (1983). Such damages are only available, however, for conduct involving "reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (*quoting Smith*, 461 U.S. at 56) (internal quotation marks omitted). "The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on [a] § 1983 claim." *Id*.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands trial by jury on all issues (injunctive relief notwithstanding) and claims under Federal and State law.

*DATED THIS:* _23rd___ day of _December___, 2019.

*Respectfully submitted,*

**Thomas G. Fallis, P.A.**
**The Blackstone Building**
**601 E. Bay Street**
**Jacksonville, FL 32202**

---and---

**Robert J. Slama, P.A.**
**6817 Southpoint Pkwy**
**Ste. 2504**
**Jacksonville, FL 32216**

  _/s/ Robert J. Slama, Esquire____
**Robert J. Slama, Esquire**
Fl. Bar. No.: **919969**
(904)296-1050 Telephone
(904)296-1844 Facsimile
Email:support@RobertJSlamaPA.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

*I HEREBY CERTIFY* that a copy of this First Amended Complaint was filed on CMECF by electronic filing on this __23rd____ day of ___December_____, 2019.

BY:_/s/ Robert J. Slama, Esquire_

Robert J. Slama, Esquire